**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher J. Kirby,<br><br>            Plaintiff,<br><br>v.<br><br>David Shinn, et al.,<br><br>            Defendants. | No. CV-21-00400-TUC-JGZ<br><br>**ORDER** |

        Plaintiff Christopher J. Kirby, who is currently confined in the Arizona State Prison Complex-Tucson, brought this civil rights action pursuant to 42 U.S.C. § 1983. On screening the First Amended Complaint (FAC) pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated an Eighth Amendment conditions-of-confinement claim in Count One against Director Shinn, Deputy Warden Martinez, Deputy Warden Schwestak, Captain Pulicicchio, and Correction Officer (CO) IV Wood, based on Plaintiff's allegations that he was subjected to excessive heat while confined in the Mental Health Unit. (Doc. 12.) The Court concluded that Plaintiff asserted an Eighth Amendment medical care claim in Count Two against Nurse Practitioner (NP) Amy Hand based on Plaintiff's allegation that Hand refused Plaintiff's request for a wheelchair after he injured his ankle. (*Id.*)

        Pending before the Court are three fully briefed motions. Defendants Shinn, Martinez, Schwestak, Pulicicchio, and Wood move for summary judgment on the merits of Plaintiff's Eighth Amendment conditions-of-confinement claims. (Doc. 108, 109, 123, 127, 134.) Defendant Hand moves for summary judgment on the merits of Plaintiff's

Eighth Amendment medical care claim. (Doc. 117, 118, 124, 125, 126, 129.)[1] Finally, in a Motion for Spoliation of Evidence, Plaintiff requests that the Court penalize Defendants for their loss or destruction of certain evidence. (Doc. 74, 90, 114, 115.)

The Court will deny Defendant Hand's Motion for Summary Judgment; grant Defendants Shinn, Martinez, Schwestak, Wood, and Pulicicchio's Motion for Summary Judgment; and deny Plaintiff's Motion for Spoliation of Evidence.

## I. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1). There is no genuine issue of material fact when a party fails to establish an element essential to that party's case and on which that

---

[1] Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Docs. 110, 119).

1  party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322–23.

2        At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**II. Defendant Hand's Motion**

      Plaintiff alleges that Defendant Hand disregarded a known risk to Plaintiff using crutches due to his hand deformity and, as a result, Plaintiff fell and suffered further injury.

      **A.   Medical Care Legal Standard**

      To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to this analysis: an objective prong and a subjective prong. First, as to the objective prong, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

      Second, as to the subjective prong, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. 825, 837 (1994). To satisfy the knowledge component, the official must both "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296

F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted); *see Estelle*, 429 U.S. at 106 (negligence does not rise to the level of a constitutional violation). Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### B.     Relevant Facts

Plaintiff is in the custody of the ADC. At the relevant time, Plaintiff was housed at ASPC-Tucson Rincon Unit and Defendant Hand worked as a medical provider at ASPC-Tucson. (Decl. of Amy Hand, Doc. 118-1 at 2 ¶ 2.)

On July 11, 2021, an Incident Command System (ICS) was initiated for Plaintiff. (Doc. 118-1 at 5.) A nurse responded to Plaintiff's housing unit and found Plaintiff lying on the floor, half in and half out of his cell. (*Id.*) Plaintiff stated that he had "gotten up for a drink because he was hot" and had fallen. (*Id.*) Plaintiff denied hitting his head and reported that he felt "tingling all over." (*Id.*) Plaintiff was unable to stand and was taken to the medical unit on a stretcher, where he was treated with one liter of normal saline. (*Id.* at 13.)

The next day, Plaintiff submitted a health needs request (HNR) stating that the day before, he had suffered a "heat stroke," passed out, and fallen to the floor. (Doc. 124 at 22.) Plaintiff wrote that his neck hurt badly, and he was having extreme headaches. (*Id.*) A note in Plaintiff's medical records states that Plaintiff was placed on the nurse's line.

(*Id.*)

On July 13, 2021, Plaintiff was seen at the medical unit. (*Id.* at 23.) The notes for the visit indicate that Plaintiff stated he did not know why he was there, his neck was still stiff, he still had headaches, and he "just got the medicine to help." (*Id.*) The notes also indicate that Plaintiff stated he still had a bump on his head. (*Id.*) Defendant Hand gave a verbal order for an x-ray of Plaintiff's cervical spine for diagnosis of his neck pain due to his fall. (*Id.*) It is unclear whether Plaintiff underwent the x-ray or what the results were.

Between August 10 and 19, 2021, Plaintiff submitted at least eight HNRs stating that since he had fallen due to "heat exhaustion," he had been experiencing ringing in his right ear, pain behind his right ear, loss of equilibrium or vertigo, and severe headaches and migraines. (Doc. 124 at 53-61.) Plaintiff reported that his symptoms affected his daily activities, including sleeping and eating. (*Id.*) Plaintiff was told on August 10 that he was scheduled for an appointment; the appointment was rescheduled at least twice. (*Id.*)

On August 19, 2021, Plaintiff was outside for recreation and had "major issues with his equilibrium." (Doc. 8 at 9.) While trying to walk to the medical unit, Plaintiff "severely rolled his right ankle and fell, causing it to swell up and turn black and blue, he also aggravated a previous back injury called lumbar spinal stenosis." (*Id.*) Plaintiff was taken by wheelchair to the medical unit, where he saw Registered Nurse (RN) Tatyana Popova. (*Id.*; Doc. 118-1 at 16.)

Plaintiff "tried to have all of his symptoms addressed, however medical stated that they were only dealing with the rolled ankle and that Plaintiff would have to wait for his appointment for the other issues." (Doc. 8 at 9.) According to Plaintiff's medical records, during the visit with RN Popova, Plaintiff reported pain at 9 on a scale of 10 and told RN Popova he thought he had broken his ankle. (Doc. 118-1 at 16.) Plaintiff also reported that he was nauseated. (*Id.* at 17.) RN Popova noted that Plaintiff's right ankle was "swollen to the size of [a] tennis ball." (*Id.*) RN Popova wrapped Plaintiff's ankle in an ACE bandage, elevated his ankle, and applied ice. (*Id.* at 17-18.) Nurse Practitioner (NP) Mary Redwine was the on-call provider at the time. (*Id.* at 18.) A note in Plaintiff's medical

records states, "Per NP Redwine order [Plaintiff] given Ibuprofen 800mg and x-ray order placed." (*Id.*)

At some point, RN Popova told Plaintiff that an x-ray needed to be retaken and the wheelchair needed to be returned. Plaintiff asked RN Popova how he was going to ambulate. (Doc. 8 at 9.) The parties dispute who made the decision to provide Plaintiff with crutches.[2] According to Plaintiff, RN Popova called Defendant Hand who ordered the crutches. (*Id.*) During the phone conversation, Plaintiff told Hand that he had a hand deformity and equilibrium issues, and "a leg that felt like spaghetti" due to lumbar spinal stenosis and requested a wheelchair. (*Id.*) Defendant Hand refused to provide a wheelchair and told Plaintiff he would be "okay."[3] (*Id.*)

In contrast, in her declaration, Hand states that she had limited involvement in Plaintiff's treatment. (Doc. 118 at ¶ 5.) She was not familiar with his pre-existing hand conditions or of any limitations he may have had using crutches, and there was no indication in the August 19, 2021 medical encounter record that Plaintiff informed Popova

---

[2] NP Hand argues that the Court should grant her motion for summary judgment and find that Plaintiff failed to identify a material issue of disputed fact because Plaintiff's filings do not conform to the requirements of Rule 56, Fed.R.Civ.P. or Rule LRCiv 56.1. Hand points out that Plaintiff's Statement of Disputed Facts, (Doc. 125), does not include separately numbered paragraphs that correspond to Defendant's Statement of Facts, nor does Plaintiff support the facts by *specific* reference to specific citations to the record. (Doc. 129 at 2-4.)

The only material factual dispute is whether NP Hand knew that Plaintiff could not use crutches due to his physical limitations. Plaintiff's facts as to Hand's knowledge are alleged in his FAC and are readily apparent in his filings. For that reason, the Court declines to grant summary judgment on the grounds that Plaintiff's Statement of Facts are not in proper form.

[3] Although Plaintiff alleged in his verified FAC that he spoke directly with Nurse Hand on August 19, 2021, in his Response to the Motion for Summary Judgment, Plaintiff states that he had Nurse Popova tell Hand that Plaintiff had a hand deformity and equilibrium issues, and a leg that felt like spaghetti, and that he requested a wheelchair. (Doc. 124 at 10.) Plaintiff provided a declaration from fellow inmate, Tyson Anderson, who swore that he heard Plaintiff inform the nurse that he could not use crutches, heard the nurse say she was going to call the provider, heard the nurse relay that information over the phone, and, after the phone was hung up, heard the nurse tell Plaintiff that the provider said Plaintiff had to use the crutches. (*Id.* at 66-69.) Although Plaintiffs' statements are not entirely consistent, they are not so contradictory that they can be disregarded on summary judgment.

of a limitation or issue with using crutches. (*Id.*) NP Hand reviewed the Nurse-ICS Response encounter record prepared by Popova and saw no reason to dispute Nurse Popova's clinical judgment as to Plaintiff's medical needs following her full physical assessment of his ankle injury. (*Id.* at ¶¶ 4-5.) NP Hand does not address Plaintiff's claim that Hand learned of his physical limitations during an August 19 phone call.

Plaintiff states that he had difficulty using the crutches and "wanted to ensure that medical was aware of the issue," so after he left the medical unit on August 19, he submitted an HNR stating the crutches hurt his right hand, he had "[no] control of the right crutch," he was "all over the place trying to operate [the crutches,]" and his equilibrium issue and vertigo were "not helping." (Doc. 8 at 10.) The HNR provides:

> I told u my equilibrium is off. I now fell down, rolling my ankle. Its really big and purple. Then I'm told I can't have a wheelchair to use. I can't walk on this foot. They tell me I get crutches. They know I have a hand deformity. It is unsafe for me to use crutches. Yet no one care. I'm still having bad migraines, ringing in my right ear on hearing loss in the same ear. How bad do I have to get before my issues get address. Pls help me and stop the deliberate indifference to my needs.

(Doc. 124 at 62.) That afternoon, a nurse responded to the HNR stating that a nurse's line appointment was already scheduled. (*Id.*)

On August 21, 2021, Plaintiff submitted an HNR stating that x-rays of his ankles had been taken, but he had not been informed of the results, and he still had not been evaluated for his extreme migraines, equilibrium issues, and ringing, pain, and hearing loss in his right ear. (Doc. 124 at 63.) Plaintiff asked for an "urgent appointment" and to be seen "ASAP." (*Id.*)

In the evening of August 22, 2021, Plaintiff was trying to shower while using the crutches. (Doc. 8 at 10.) When he tried to get out of the shower, he slipped and fell, hitting his face on the floor. (*Id.*) Plaintiff suffered a black eye and concussion and injured his back. (*Id.*) He was taken to the Banner University Medical Center-Tucson emergency room by ambulance. (Doc. 118 at ¶ 9.) A laceration above Plaintiff's right eye was sutured. (Doc. 118-1 at 48.) Plaintiff was released from the emergency room the same day. (Doc. 118 at ¶ 11.)

On August 23, Plaintiff wrote in an HRN:

> I got back from the hospital at 11:30 pm, they used a wheelchair to get me to my bed, I can't even get myself to the toilet, I have to pee in a soda bottle, they didn't even feed me breakfast, I can't walk because of my back, the hospital report says I am supposed to go back in 1or 2 weeks to see a spine specialist. I need a wheelchair please, I can't use crutches, I am also in severe pain, please help me.

(Doc. 124 at 62.)

### C. Analysis

In her Motion for Summary Judgment, Defendant Hand argues that she was not deliberately indifferent to Plaintiff's serious medical needs. Her involvement was limited to two occasions, August 19 and August 20, and included only approving the request for x-ray, reviewing the x-ray, and reviewing Nurse Popova's treatment record. (Doc. 117 at 1-2.) Further, NP Hand argues that, based on her review of the encounter record, she had no reason to dispute Popova's determination of Plaintiff's medical needs and Popova's order for crutches. (*Id.*) Hand argues there is no evidence that she "approved" an order for crutches. (*Id.* at 2.)

#### 1. Serious Medical Need

Examples of indications that a prisoner has a serious medical need include: "The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059–60. Defendant does not dispute that Plaintiff's ankle injury was a serious medical need. The evidence supports a finding of a serious medical need.

#### 2. Deliberate Indifference

Assuming the truth of the facts alleged in the FAC, at the August 19, 2021 visit following Plaintiff's fall, Plaintiff asked RN Popova how he would walk with his ankle injury, and Popova called Defendant Hand. Defendant Hand ordered crutches for Plaintiff, and, although Plaintiff informed Defendant Hand that he had a hand deformity, equilibrium issues, and "a leg that felt like spaghetti," Hand refused Plaintiff's request for a wheelchair. (Doc. 8.)

To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was medically unacceptable under the circumstances and was chosen in conscious disregard for an excessive risk to the prisoner's health. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). A difference of opinion with a medical provider about the appropriate medical diagnosis or treatment does not establish a deliberate indifference claim. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Defendant Hand was aware that Plaintiff could not safely use crutches given his right-hand deformity, equilibrium issues, and other symptoms, and that by refusing Plaintiff's request for a wheelchair, Defendant Hand put Plaintiff at substantial risk of serious harm. This is not a mere disagreement between Plaintiff and Defendant Hand about a course of treatment. There is a genuine dispute of material fact regarding whether Defendant Hand was aware of Plaintiff's physical limitation and therefore deliberately indifferent to Plaintiff's serious medical needs in denying his request for a wheelchair. Thus, the Court will deny Defendant Hand's Motion for Summary Judgment.[4]

### III. Defendants' Shinn, Martinez, Schwestak, Pulicicchio, and Wood's Motion for Summary Judgment

In their motion for summary judgment, the ADC Defendants argue that Plaintiff cannot prove that prison conditions violated the Eighth Amendment or that the ADC Defendants were deliberately indifferent. The ADC Defendants also argue they are entitled to qualified immunity. (Doc. 108.)

#### A. Conditions of Confinement Legal Standard

To prevail on a claim under the Eighth Amendment for unconstitutional conditions of confinement, a prisoner must demonstrate deliberate indifference to a substantial risk of

---

[4] Hand argues in her Reply that there is no record evidence establishing NP Hand consciously or even recklessly disregarded known risk of significant injury to Plaintiff. (Doc. 129 at 1.) On summary judgment, Plaintiff's verified complaint and the declaration of Tyson Anderson constitute record evidence.

serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Eighth Amendment liability requires "more than ordinary lack of due care." *Id.* at 835. The prisoner must show a "substantial risk of serious harm[,]" meaning that the risk must be objectively sufficiently serious. *Id.* at 834. In addition, the defendant official must have a sufficiently culpable state of mind; that is, he must be deliberately indifferent. *Id.*

To demonstrate that a prison official was deliberately indifferent, a plaintiff must show that the "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Farmer*, 511 U.S. at 837; *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187-88 (9th Cir. 2002). To prove that officials knew of the risk, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *See Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

With respect to temperature, a prisoner may assert a claim for unconstitutional conditions based on exposure to temperature extremes. *See Hoptowit v. Spellman*, 753 F.2d 779, 783-84 (9th Cir. 1985). Whether conditions of confinement rise to the level of a constitutional violation may depend on the duration of a prisoner's exposure to those conditions. *Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998).

**B.    Facts**

The Mental Health Unit at Rincon Unit comprises two buildings, Building 10 and Building 11. During the relevant time, Plaintiff was housed in Building 10. Defendant Martinez was the Deputy Warden at Rincon Unit. (Decl. of Jorge Martinez, Doc. 109-2 at 2 ¶ 1.) Defendant Schwestak was an Associate Deputy Warden at Rincon Unit. (Decl. of Kaci Schwestak, Doc. 109-3 at 2 ¶ 1.) Defendant Wood was the Unit Grievance Coordinator at Rincon Mental Health Unit. (Decl. of Richard Wood, Doc. 109-4 at 2 ¶ 2.) Defendant Pulicicchio was Chief of Security at Rincon Unit. (Decl. of Marc Pulicicchio,

Doc. 109-5 at 2 ¶ 1.)

In recognition of Arizona's extreme summertime temperatures, which can present a potential hazard to inmate health, beginning each April 1, ADC staff are required to take the temperatures in each unit each day at 11:00 a.m., when temperatures begin to rise, and at 3:00 p.m., when temperatures typically reach their highest. (Doc. 109 at ¶¶ 1-2.) ADC has data for the summer temperatures in all ADC cellblocks, including Rincon Building 10, during Summer 2021. (*Id*. at ¶ 1.) Temperatures are taken using an anemometer. (*Id.* ¶ 3.) The officer taking the temperature readings calls the readings in to the shift sergeant, who logs them into an Excel spreadsheet. (*Id.* ¶ 4.) Temperatures are measured in one cell on each tier, in each pod of the linear or H-style cellblocks, alternating daily between cells in the front, middle, and end of each tier. (*Id.* ¶ 5.) In cluster-style cellblocks, temperatures are taken in one cell in each tier, in two pods within every cluster, again alternating daily between front, middle, and end cells. (*Id.* ¶ 6.)[5] This process was followed in Rincon's Mental-Health Unit (Buildings 10 and 11). (*Id.* at ¶ 7.)

The objective in monitoring temperatures was to keep temperatures below 85 degrees in the Mental Health Unit. (Decl. of Kaci Schwestak, Doc. 109-3 at 2 ¶ 4.) Temperature logs for Buildings 10 and 11 for June 1 to August 31, 2021, show that temperatures rarely exceed 85 degrees and did not exceed 90 degrees.[6] (*Id*. at 2 ¶ 6.) On

---

[5] Plaintiff agrees that ADC procedures require staff to record temperatures in the cellblocks. Plaintiff points to the March 23, 2021 memorandum from the Regional Operations Directors to all Wardens setting forth procedures to follow regarding taking and recording temperatures in the cellblocks. (Doc. 123 at 89-91.) Each complex was required to purchase and use a HoldPeak digital anemometer, model HP-866B, and to "follow provided instructions which require operation of the equipment for approximately two (2) minutes to obtain an accurate reading." (*Id.* at 89.) If the temperature in a cell exceeds 95 degrees, the Shift Commander is required to notify the Deputy Warden or the On Call Duty Office, and immediate steps are to be taken to bring the temperature down, such as adding loaner fans and/or opening traps, placing floor fans in the pod, providing ice, and permitting extra showers. (*Id.* at 90.) The memorandum specifies that if a prisoner who is taking psychotropic medication suffers a heat intolerance reaction, all reasonably available steps will be taken to prevent heat injury or illness. (*Id.* at 91.) If all other steps have failed to abate heat intolerance reaction, the prisoner will be transferred to a housing area where the cell temperature does not exceed 85 degrees. (*Id.*)

[6] In his declaration, Plaintiff states that the temperatures in Building 10 were above 85

- 11 -

July 11, 2021, the warmest temperature recorded in Building 10 was 84 degrees. (*Id*. at 2 ¶ 7.) Records from May to August 2021, show that morning temperatures in Buildings 10 and 11 ranged between 70 degrees to 88 degrees. (Doc. 109 at ¶ 8.) Morning temperatures approached or exceeded 85 degrees only a handful of times and reached 88 degrees only on July 12. (*Id.*) Afternoon temperatures ranged between 74 degrees and 91 degrees and exceeded 85 degrees on four occasions: June 15 (88 degrees); June 18 (91 degrees); July 10 (90 degrees); July 12 (88 degrees).[7] (*Id*.)

Defendant Schwestak shared responsibility with the Deputy Warden to ensure that the air-handler systems, including evaporative coolers, were functioning before the summer months. (Decl. of Kaci Schwestak, Doc. 109-3 at 2 ¶ 2.) The evaporative cooling system for Building 10 was not broken,[8] but at the hottest times, the system did struggle to

---

degrees on multiple occasions. (Doc. 127 at ¶ 8.) Although Plaintiff does not provide a basis for this assertion, it is not inconsistent with ADC's evidence.

[7] Plaintiff alleges that the temperature logs do not reflect the actual temperatures in the cells because officers have a history of not following the directions for the handheld thermometer, and officers used an anemometer or temperature gauge other than the HoldPeak digital anemometer specified in the Memorandum to ADC Wardens. (Doc. 123 at ¶ 4.) Plaintiff's evidence does not establish a disputed issue of fact as to the accuracy of the temperature records. Plaintiff fails to present competent evidence that officers used the wrong anemometer to measure temperatures or failed to follow the device instructions. (See Doc. 123 at ¶ 17.) Moreover, such evidence would not, standing alone, demonstrate that temperature readings taken with a different type of thermometer were inaccurate.

Plaintiff also asserts that historical weather data for Tucson demonstrates that the logged temperature readings for the cells are inaccurate. He argues that it would be impossible for cell temperatures to be same on two consecutive days when the outside temperature varied by up to three degrees. (Doc. 127 at ¶ 19; Doc. 123 at ¶ 15.) This argument is logically flawed; it assumes there is a direct correlation between outside and inside temperatures and does not account for the efforts employed by ADC to cool the cell blocks. Plaintiff's evidence regarding the alleged inaccuracy of the logs does not create a material issue of fact.

[8] In his declaration, Plaintiff states that the evaporative coolers were broken when he was moved into Building 10. (Doc. 127 at ¶ 14.) However, the Work Request that Plaintiff cites in support relates to the repair only of the grates of the cooler. Moreover, the Work Request was entered on May 25, 2021, before Plaintiff arrived at the Rincon Unit. (Doc. 123 at 27.) There is no evidence that the grates effect the functioning of the cooler or that the work was not completed prior to Plaintiff's arrival. The "Work Performed" section of the Work Request states, "completed and picked up," but it is not signed or dated. (*Id.*)

keep the cellblock cool. (Docs. 109-3 at 2 ¶ 5; 109 at ¶¶ 9-10.) Staff took steps to help out the evaporative coolers in an attempt to keep temperatures below 85 degrees. (Doc. 109 at ¶ 11.) For instance, cell door food traps were propped open to facilitate air flow. (*Id.*) An industrial-size fan and a 3 ft. by 5 ft. portable evaporative cooler were placed on each run (the aisle between two facing rows of cells). (*Id.* at ¶ 12.) The evaporative coolers were filled with ice to make the air flow as cold as possible.[9] (*Id.* at ¶ 13.) Prisoners were permitted to take showers on request during these summer months.[10] (*Id.* at ¶ 14.) Igloo-type coolers with unlimited ice were provided, and prisoners could fill their cups with ice water whenever they wanted. (*Id.* at ¶ 16.)

Plaintiff attached to his filings a June 18, 2021, email from Sergeant Segura to Defendants Martinez, Schwestak, Pulicicchio, Wood, and others. (Doc. 123 at 44.) The e-mail shows that officers were monitoring temperatures and taking steps to address the heat. Sergeant Segura reported that: "Temperatures in the housing units dropped initially this morning, but they are back up to high 80[]s, low 90[]s in HU10 and fluctuating between mid-to low 80[]s in HU11." Sergeant Segura stated that, "[Officers] are still allowing showers on request, offering ice regularly, and have the traps open in HU10. The traps have been closed in HU11 since the temperatures dropped below 85." (*Id.*) The e-mail states that at 2:00 p.m., the temperature in 10A was 88, the temperature in 10B was 89, the

---

[9] In his Declaration, Plaintiff avers that the portable swamp coolers were broken, although he does not specify when or for how long or how he knows they were broken. Plaintiff cites to the declarations and statements of other inmates who said that they told the Defendants that the coolers were broken and that the Defendants refused to fix or replace them. (Doc. 127 at ¶¶ 5, 16.) These declarations and statements suffer the same defect; they do not show how the declarant knew the coolers were broken or when or for how long. Plaintiff suggests that evidence includes the fact that an inmate slipped and fell on the water that had leaked out of the portable cooler. (Doc. 127 at ¶ 6.) However, discharge of water from a cooler does not necessarily demonstrate disrepair, and Plaintiff provides no evidence that it did in this instance. Thus, this evidence does not present a disputed issue of fact as to the operability of the coolers.

[10] Plaintiff's statement that the showers were broken for 36 days is unsupported and inconsistent with his later statements and those of other inmates that the showerheads were not functioning properly. Even if the shower heads were not working well, this defect would not affect one's ability to use shower water to cool down.

temperature in 11A was 86, and the temperature in 11C was 86. (*Id.*) At 3:00 p.m., the temperature in 10C was 91. (*Id.*)

Staff also monitored prisoners for signs of heat-related distress and "would take appropriate steps if it were ever observed, including initiating ICS and calling for medical assistance." (Doc. 109 at ¶ 17.) The only heat-related incident that summer known to any of the ADC Defendants is the July 11 incident alleged in Plaintiff's complaint.[11] (*Id.* at ¶ 18.)

All of the ADC Defendants acknowledge that temperatures in Building 10 were occasionally uncomfortable, but none of them ever thought conditions were unbearable and none ever drew the conclusion that they were dangerous to inmates, including Plaintiff. (*Id.* at ¶ 19.) Other than Director Shinn, the ADC Defendants lacked the authority to order replacement of the air-cooling system or to close down the unit. (*Id.* at ¶¶ 20-24.)

Plaintiff was relocated to building 10 on June 1, 2021. (Doc. 127 at ¶ 3.) Plaintiff participated in a June 4th inmate hunger strike to protest unconstitutional conditions of Building 10. (*Id.* at ¶ 4.) However, heat and cooling were not issues identified by the prisoners in their list of demands. (Doc. 123 at 36.)

---

[11] Plaintiff asserts that several inmates suffered heat-related injuries during the Summer of 2021. (Doc. 127 at ¶ 17.) Plaintiff submits Declarations of Roque Eliseo, Jose Rodriguez, and Musaibli Abdullah, but these declarations do not show that any named Defendant was aware of an inmate suffering an injury due to high temperatures in the cells and lack sufficient detail to establish that the inmate suffered a heat-related injury due to high temperatures in the cells. Eliseo declares that at the end of June 2021, he "ha[d] a bad reaction to the elevated heat," became "extremely dizzy[,] and fell out." (Decl. of Roque Eliseo, Doc. 123 at 57 ¶ 8.) Rodriguez declares that in mid-June 2021, he had "serious heat related symptoms and fell out." (Decl. of Jose Rodriguez, Doc. 123 at 59 ¶ 8.) Abdullah declares that in early July 2021, he "suffered heat related injuries." (Decl. of Musaibli Abdullah, Doc. 123 at 61 ¶ 6.) Abdullah avers that he was "found on the floor, non-coherent and extremely dizzy." (*Id.*)

Plaintiff also submits statements signed by inmates David Szymanski and Marvin Potts, in which they state that they suffered heat-related injuries in the summer of 2021. (*Id.* at 69-71.) However, neither statement is signed under penalty of perjury, Szymanski's statement does not show that the Defendants were made aware that he was claiming a heat-related injury, and Potts claims he fell in a designated recreational area. (*Id.*) Thus, the declarations and statements do not create a material issue of fact.

On July 11, 2021, CO II Encinas called a medical ICS for Plaintiff after observing Plaintiff laying down on the floor. (Doc. 109-2 at 5-7.) The ICS Report shows that CO II Encinas requested medical assistance, a "man down bag," and a supervisor. (*Id.* at 7.) Sergeant Flannagan, CO II Aros, and medical staff arrived several minutes later. (*Id.*) Medical staff evaluated Plaintiff, and he was placed on a gurney and taken to the Behavioral Health Unit for further evaluation. (*Id.*) Medical staff then sent Plaintiff to Rincon Building 9 for IPC/IV for rehydration. (*Id.*) An IV was completed, and Plaintiff was released back to the BHU. (*Id.*) A July 12, 2021 supplement to the report, under the "Comments/Action Taken" section, states CO IV Wood and DW Martinez spoke with Plaintiff, and "[t]he cooling issue is being addressed and is currently with Central Office [and] maintenance." (*Id.* at 10.) According to Defendant Martinez, the sentence referring to "the cooling issue," indicates that complaints about the "sometimes uncomfortable conditions" in Buildings 10 and 11 were elevated to ADC[]'s Central Office. (Decl. of Jorge Martinez, Doc. 109-2 at 3 ¶ 13.)

In his Response to the Motion for Summary Judgment, Plaintiff explains that on July 11, he was outside for recreation around 1:30 p.m. when he began having symptoms of heat exhaustion. (Doc. 123 at 3.) He informed an officer who sent Plaintiff to the medical unit where he was seen by a nurse. (*Id.*) The nurse informed Plaintiff that he needed to get out of the heat and drink a lot of water. (*Id.*) Twenty minutes later, Plaintiff returned to his cell. He was not able to cool down, and two hours later, when he stood up, he blacked out, and hit the back of his head. (*Id.*)

An August 2, 2021 Information Report from Sergeant Rivera to Defendant Pulicicchio documents that on July 12, 2021, while conducting temperature checks in Building 10, staff advised the temperatures in the runs have exceeded 85 degrees. Sergeant Rivera stated that "Hourly temperatures [checks] will continue throughout the day. All fans and swamp coolers are on down each run. Ice offered to the population." (Doc. 123 at 46.) In the Comments/Action Taken section of the Report, a note states, "Each run has 2 portable coolers and 1 fan in HU10, Per ADW Schwestak." (*Id.*)

- 15 -

On September 27, 2021, an e-mail was sent to all Rincon Unit prisoners stating, "Daily temperatures are at a reasonable level, and the housing units are not nearly what they had been. As such, we will be modifying operations in the house. These changes will take effect today 09/28/21. If temperatures rise to previous levels, we will evaluate appropriate additional cooling measures." (*Id.* at 39 ¶ 3.)

### C. Discussion

#### 1. Defendant Shinn

Plaintiff sues Defendant Shinn in his official capacity. A claim against an individual in his or her official capacity is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).

Plaintiff cannot maintain a lawsuit for damages against Defendant Shinn in his official capacity. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officials sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) ("[A] state is not a 'person' for purposes of section 1983. Likewise[,] 'arms of the State' such as the Arizona Department of Corrections are not 'persons' under section 1983.") (citation omitted). Although Plaintiff can maintain a lawsuit for prospective injunctive relief against ADC's officials in their official capacities, Plaintiff does not seek injunctive relief in his complaint. (*See* Doc. 8.) The Court will therefore grant summary judgment in favor of Defendant Shinn.

#### 2. Defendants Martinez, Schwestak, Wood, and Pulicicchio

To demonstrate that Defendants Martinez, Schwestak, Wood, and Pulicicchio were deliberately indifferent to the conditions in Buildings 10 and 11, Plaintiff must show that they "[knew] of and disregard[ed] an excessive risk to inmate . . . safety." *Farmer*, 511

U.S. at 837. Plaintiff must show that each Defendant was "both [] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and each Defendant "must also draw the inference." *Id.* Prisons officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Farmer*, 511 U.S. at 844. Liability may also be avoided by demonstrating that defendant's response was reasonable in light of all the circumstances. *Id.* at 844–45.

The Constitution does not mandate comfortable prisons. *Rhodes v. Chapman*, 452 U.S. 3337, 349 (1981). The Eighth Amendment guarantees an "adequate" temperature, "but not necessarily a 'comfortable' temperature." *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010); *see Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (affirming summary judgment for defendants where plaintiff alleged only that average temperatures in his cell "tend[ed] to be either well above or well below room temperature ... which suggest[ed] only that the temperature was not comfortable").

Plaintiff contends a reasonable jury could find that temperatures in Buildings 10 and 11 reached 85 degrees and higher "multiple times," and as a result, at least five prisoners, including Plaintiff, suffered heat-related injuries. (Doc. 123 at 4.) Plaintiff claims that Defendants did not take sufficient steps to ameliorate the heat: they did not bring sufficient swamp coolers; some of the coolers were broke; and some of the coolers leaked. (*Id.* at 3.) Plaintiff alleges that at times his cell reached more than 95 degrees. (*Id.*)

Plaintiff was not subjected to cruel and unusual punishment as a result of the temperatures in Building 10 in the summer of 2021. Prison logs show that in the seven months between April 1 and October 31, 2021, the temperatures in Buildings 10 and 11 exceeded 85 degrees on a handful of occasions. The morning temperatures in Building 10 and 11 ranged from 70 degrees to 88 degrees, rarely exceeded 85 degrees, and did not

exceed 90 degrees. Afternoon temperatures ranged between 74 degrees and 91 degrees and exceeded 85 degrees on four occasions: June 15 (88 degrees); June 18 (91 degrees); July 10 (90 degrees); July 12 (88 degrees). Plaintiff's contention that the temperatures were higher is unsupported. Undoubtedly, the cells were uncomfortable in the summer. But the high temperatures were neither consistent nor frequent. For example, on June 18, the temperature reached 91 degrees, but the next day, June 19, the highest temperature logged was 86 degrees. According to the logs, the inside temperature never exceeded 95 degrees, the threshold at which the ADC memorandum directed staff to take extra steps to reduce temperatures.[12]

Plaintiff reads *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010) as setting an 85 degree threshold for temperatures in a mental health unit. In *Graves*, the Ninth Circuit affirmed an injunction requiring Sheriff Arpaio to house pretrial detainees taking psychotropic medications in cells where temperatures do not exceed 85 degrees. *Id*. at 1049. The court explained:

> We have held that the Eighth Amendment guarantees adequate heating, but not necessarily a "comfortable" temperature. One measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses "a substantial risk of serious harm." Accepting the district court's factual finding that temperatures in excess of 85° F greatly increase the risk of heat-related illness for pretrial detainees taking psychotropic medications, it follows that the Eighth Amendment prohibits housing such pretrial detainees in areas where the temperature exceeds 85°.

*Id*. (internal citations omitted). *Graves* does not require a finding that the conditions in the Rincon Unit were per se unconstitutional. For one thing, the temperatures in the Rincon Unit rarely exceeded 85 degrees in the Summer of 2021. But more importantly, as noted in the *Graves* decision, a measure of an inadequate, as opposed to merely uncomfortable, temperature is that it poses a substantial risk of serious harm.

Plaintiff presents little evidence that the temperatures in the cellblock in the Summer of 2021 posed a substantial risk of serious harm to himself and other inmates. Accepting as true that Plaintiff's fall on July 11, 2021 was heat-related, the July 11 incident is the only incident of harm, known to Defendants, caused by the heat during the hot summer

---

[12] See nt. 5, *supra*.

- 18 -

months.[13] Moreover, the highest temperature recorded on that date was 84 degrees, which is lower than the threshold temperature that Plaintiff identifies as putting prisoners who take psychotropic medications[14] at higher risk of heat-related injuries. Notably, Plaintiff's injury occurred after he participated in outdoor recreation at 1:30 in the afternoon. The July 11 incident is insufficient to support a conclusion that the temperatures in the cells in Buildings 10 and 11 were so high that Defendants knew or should have known that heat-related injuries were likely to result.

Finally, ADC had in place procedures to monitor the temperatures in response to the extreme heat. ADC monitored the temperatures in the cells from May to August, taking and recording temperatures in different cells at least twice a day, and sometimes hourly. This process was followed in Rincon's Mental-Health Unit (Buildings 10 and 11). ADC implemented measure to address excessive heat. There was an evaporative cooling system for Building 10, and to the extent it could not keep the cellblock cool, ADC staff propped open cell door food traps to facilitate air flow; placed industrial-size fans and 3 ft. by 5 ft. portable evaporative coolers in the aisles between two facing rows of cells; and filled the evaporative coolers with ice to make the air flow as cold as possible. In addition, to ameliorate the effects of the heat, prisoners were permitted to take showers on request during the summer months and Igloo-type coolers with unlimited ice were provided where prisoners could fill their cups with ice water whenever they wanted.

Plaintiff fails to present evidence of a material issue of fact that would prevent entry of summary judgment in favor of ADC Defendants. Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the ADC Defendants were not deliberately indifferent, and thus, are entitled to summary judgment.

**IV. Conclusion**

For the foregoing reasons,

---

[13] The insufficiency of Plaintiff's proffered evidence as to other inmate heat-related injuries is addressed at nt. 11, *supra*.

[14] The ADC Defendants dispute that Plaintiff takes psychotropic medications. This factual dispute is not material to the Court's conclusion.

**IT IS ORDERED:**

1. Plaintiff's Motion for Spoliation of Evidence (Doc. 74) is **denied**.[15]

2. Defendant Hand's Motion for Summary Judgment (Doc. 117) is **denied**.

3. Defendants Shinn, Martinez, Schwestak, Wood, and Pulicicchio's Motion for Summary Judgment (Doc. 108) is **granted**.

4. Defendants Shinn, Martinez, Schwestak, Wood, and Pulicicchio are **dismissed with prejudice**.

5. The remaining claim is the Eighth Amendment medical care claim against Defendant Hand.

Dated this 29th day of September, 2023.

_____
Jennifer G. Zipps
United States District Judge

---

[15] In his Motion for Spoliation of Evidence, Plaintiff seeks sanctions because the ADC Defendants cannot produce video from the security and medical staff response to the July 11, 2021 incident (the "ICS call") or from the closed-circuit security cameras outside the entrances to the medical unit and Buildings 9 and 10. Plaintiff also appears to assert that there is spoliation of maintenance records related to the alleged planned replacement of the evaporative-cooling system in Building 10.

Video of Plaintiff's request for medical assistance after he became overheated at outdoor recreation would not assist the resolution of the motions for summary judgment. The Court has accepted Plaintiff's assertion that he suffered a heat-related injury after outdoor recreation on July 11. The ADC Defendants have already explained that there are no records related to replacement of the evaporative-cooling system. Nonetheless, such evidence is not necessary to resolve the pending motion, because the Court accepts, and the Defendants admit, that the existing evaporative cooling system struggled to keep up with the heat. Accordingly, the Court will deny Plaintiff's Motion for Spoliation. In addition, because the Court is granting the ADC Defendants' Motion for Summary Judgment, the Court will deny as the motion as moot to the extent Plaintiff requests sanctions at trial based on spoliation of this same evidence.